E-FILED
Thursday, 13 June, 2013  10:26:38 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JESSE J. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cv-3073 |
| | ) | |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Jesse J. White appeals from the denial of her application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  White has filed a Motion for Summary Judgment (d/e 7), and Defendant Acting Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 14).[1]  The District Court referred this matter for a Report and Recommendation.  Text Order entered February 2, 2013.  For the

---

[1] This Court takes judicial notice that Carolyn Colvin is now Acting Commissioner of Social Security. Colvin is, therefore, automatically substituted in as the Defendant in this case. Fed. R. Civ. P. 25(d).

reasons set forth below, this Court recommends that the Decision of the
Commissioner should be reversed and remanded for further proceedings.

## STATEMENT OF FACTS

White was born on September 23, 1971.  He completed the eleventh
grade.  He previously worked as a cashier, construction worker, cook,
landscape laborer and general laborer.  On April 23, 2007, White suffered
an injury to his left knee in an accident at work.  He has not worked since.
Answer to Complaint (d/e 5), attached Certified Transcripts of Proceedings
before the Social Security Administration (R.), at 289, 363-68, 414.

On May 17, 2007, White saw Dr. Jacques VanRyn, M.D., complaining
of left knee pain and swelling.  White reported consistent pain since the
accident.  He also reported trouble weight bearing.  White was limping
significantly.  Dr. VanRyn noted that the limping was causing pain in the
low back and over the posterior superior iliac spine (PSIS) without radicular
pain.  Dr. VanRyn diagnosed a probable lateral meniscus tear plus patellar
contusion.  He also diagnosed a little back strain from White's gait.  R. 414-
15.  Dr. VanRyn ordered an MRI of the knee.  The MRI was performed on
May 22, 2007, at the DePaul Health Center in Bridgeton, Missouri.  The
MRI showed marrow edema, non-displaced fracture involving the medial

femoral condyle with marrow edema, micro-fractures involving the tibial plateau, and a tear in the medial meniscus.  R. 419.

On June 20, 2007, White saw Dr. VanRyn.  White complained of persistent pain and discomfort in his left knee.  He reported that he felt as if the left knee was going to give way.  He reported that he was unable to bear full weight due to pain and discomfort.  He reported that a previous cortisone shot helped with the pain and swelling.  He reported occasional painful popping.  R. 410.

On examination Dr. VanRyn observed that White ambulated with a marked antalgic gait, and quick component on the left.  White was 5 feet 10 inches tall and weighed 275 pounds.  White had a 1+ effusion.  His range of motion in the knee was limited.  White also had moderate tenderness to palpitation over his medial joint line, mild tenderness over his lateral joint line and along his lateral collateral ligament, as well as pain in the medial aspect of his joint with McMurray's without palpable clicking.  R. 411. White's motor strength in the left knee was 5/5.  Dr. VanRyn diagnosed a left knee contusion with significant bone bruising, mild lateral collateral ligament sprain, and a left knee medial meniscus tear.  R. 412.  Dr. VanRyn recommended a left knee arthroscopy and partial medial meniscectomy. R. 412.

On July 16, 2007, White saw Dr. VanRyn again.  He continued to complain of persistent pain, discomfort, and instability in the knee.  White then underwent the arthroscopy and partial medial meniscectomy surgery that same day.  Dr. VanRyn performed the surgery.  R. 416-17.

On July 23, 2007, White saw Dr. VanRyn for a follow-up.  White reported that he was doing well but his knee was moderately sore.  On examination, White had a mild joint effusion and had limited range of motion.  Dr. VanRyn diagnosed stable post-operative partial medial meniscectomy.  Dr. VanRyn stated that White would need to undergo seven to eight weeks of gentle range of motion exercises and would need to avoid any kind of bending, twisting or impact activity.  Dr. VanRyn also stated that White was to refrain from any heavy labor, extended walking, bending or twisting of the knee during the eight-week period.  R. 408.

On August 15, 2007, White saw Dr. VanRyn for a follow-up.  White reported that the knee was moderately sore.  On examination, White had recovered full range of motion with some tenderness over the joint line and pain at the limits of flexion and extension.  Dr. VanRyn observed scant joint effusion and well-healed portals.  Dr. VanRyn directed White to continue with water exercises and walking, and to start a strengthening program using ankle weights.  R. 407.

On October 3, 2007, White saw Dr. VanRyn.  White reported that he was doing fairly well and was compliant with his exercise program.  White complained of occasional pain with ambulating long distances and difficulty squatting.  On examination, White's incision portals were well-healed; White had full range of motion in the knee with pain at end range of flexion and extension; he had no joint effusion; his motor strength was 5/5 with intact sensation; and he ambulated with a normal gait.  Dr. VanRyn diagnosed a stable post-operative left knee arthroscopy, medial meniscectomy and lateral femoral condyle chondral injury.  Dr. VanRyn scheduled White for four weeks of work hardening.  R. 405.

On October 11, 2007, White went to the Memorial Industrial Rehabilitation Center, in Jacksonville, Illinois, for work hardening therapy. White reported to the therapist that he had a flare-up of gout the week earlier on the right.  He reported knee pain and occasional back pain since the knee surgery.   R. 373.  The therapist assessment stated, "The client is currently functioning within the medium physical demand level with all lifts and carries."  R. 380.  The therapist set goals for White to achieve.  White told the therapist that "he wants to be employable 'to perform a manual labor job that involves lifting and being outside.'"  R. 373.

On October 31, 2007, White saw Dr. VanRyn.  White reported that he was still experiencing intermittent sharp pain through his left knee.  White had full range of motion, no significant pain at limits of extension, and no effusion.  He had moderate peripatellarly tenderness and over the medial joint line.  Dr. VanRyn diagnosed White with post-operative left knee arthroscopy and chondral feature doing fairly well, although still symptomatic, but functionally doing significantly better.  Dr. VanRyn continued White's rehabilitation program .  Dr. VanRyn stated that he would release White to work without restrictions on November 7, 2007.  R. 404.

On November 8, 2007, White went to the Memorial Industrial Rehabilitation Center, in Jacksonville, Illinois, for work hardening therapy. White participated in a one-day conditioning reevaluation.  White reported that he continued to have left knee pain depending on his activities.  He reported being tired due to lack of sleep.  He reported no real improvement in standing or lifting from the therapy, but noticed improved strength in his legs.  He reported that his gout was not bad in his right knee of the date of the evaluation.  R. 430.  The therapist again opined that White demonstrated the ability to perform medium work with all lifts and carries. R. 431.  White also demonstrated significant abilities in crawling, repetitive

squatting, walking, climbing stairs, balancing, and pulling and pushing.  R. 431.

On March 3, 2008, White saw Dr. VanRyn for a follow-up.  White reported that he was performing activities of daily living and some strenuous activities including tree limb removal.  As a result White reported increased soreness in his both knees.  He was taking Relafen for the pain. White reported waking at night with occasional pain and stiffness, but no numbness or paresthesias.  On examination, White had no effusion, 5/5 motor strength in his knee and almost full range of motion.  Dr. VanRyn stated that White's knee was ligamentously stable with intact sensation to light touch.  White had mild medial joint line tenderness, but not lateral joint line tenderness.  Dr. VanRyn diagnosed White as stable post-operative left knee arthroscopy, partial medial meniscectomy, and left medial femoral condyle fracture.  Dr. VanRyn opined that White had reached maximum medical improvement and would have permanent limitations of no crawling or heavy shoveling; avoiding crouching, squatting, and lifting greater than thirty-five pounds; and "inability to walk on uneven surfaces such as pitched roofs."  R. 402.

On April 28, 2008, state agency physician Dr. Ernst Bone, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 420-27.

Dr. Bone opined that White could lift and/or carry twenty pounds occasionally and ten pounds frequently; could stand and/or walk for about six hours in an eight-hour day; could sit for about six hours in an eight-hour day; could frequently climb ramps and stairs; could occasionally climb ladders, ropes, and scaffolds; could occasionally crouch and crawl; and should avoid concentrated exposure to hazards.  R. 421-24.

On October 24, 2008, White went to the emergency room at Passavant Area Hospital in Jacksonville, Illinois, complaining of pain in his left knee.  R. 477.  White had limited range of motion in the knee and some swelling.  An x-ray of the knee showed no recent or destructive bony abnormalities.  R. 476.  White was given a prescription for medication and discharged.  R. 478.

On November 12, 2008, White saw Dr. VanRyn.  White complained about pain that went from his left knee to his groin.  He also was sore in his left hip and buttock area.  White ambulated with an antalgic gait with a quick component on the left and some tenderness in the left PSIS.  There was no numbness, no paresthesias, and no unusual swelling.  An x-ray of his pelvis was unremarkable.  Dr. VanRyn diagnosed left knee arthritis from his chondral injury.  R. 529.  Dr. VanRyn recommended a series of

OrthoVisc injections.  White received the injections between December 8, 2008, and December 15, 2008.  R. 526-28.

On February 6, 2009, White saw Dr. VanRyn.  White complained of considerable left knee pain with bending and twisting or with spending periods of time on his feet.  White reported that the pain really did not go away with the OrthoVisc injections.  White had an antalgic gait with a quick component on the left.  White had tenderness over the medial joint line and pain at the limits of extension and flexion.  Dr. VanRyn observed no joint effusion.  White was stable to ligamentous stress testing.  Dr. VanRyn again stated that White reached his maximum medical improvement.  Dr. VanRyn opined that White had permanent limitations of no crawling, heavy shoveling, crouching, squatting, lifting more than thirty-five pounds, and no walking on uneven surfaces.  Dr. VanRyn also opined that White should not do any work "requiring bending or twisting through the knees."  R. 655.

On February 9, 2009, White saw agency physician Dr. Joseph J. Kozma, M.D., for a consultative examination.  R. 551-56.  White was 69 inches tall and weighed 269 ½ pounds.  R. 552.  White reported that he could not walk a block because of the pain in his left knee and low back. He also reported that he could be on his feet for ten minutes but his legs would tingle.  R. 555.  Dr. Kozma found mild tenderness in the left knee,

mild limping on one side, and no convincing evidence of a problem with the lower back.  The circumference of White's left knee was an inch and a quarter larger than the right.  R. 544-55.  White had limitations in his range of motion, had pain in both knees and radiating pain in his left leg, and did not perform heel walking because of left knee pain.  White had a cane recommended by his orthopedic surgeon, but he did not use it all of the time.  R. 555.  Dr. Kozma's impression was obesity and posttraumatic and surgical condition of the left knee with pain and decreased range of motion; chronic low back pain without any determined cause; diabetes that was presumably poorly controlled; and mild scleritis. R. 556.

On February 19, 2009, state agency physician Dr. Bharati Jhaveri, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 557-64.  Dr. Jhaveri opined that White could lift and/or carry ten pounds frequently and no more occasionally; could stand and/or walk for two hours in an eight-hour day; could sit for six hours in an eight-hour day; could never climb ladders, ropes, or scaffolds; and could occasionally climb ramps or stairs, kneel, crouch, or crawl.  R. 559.

On June 10, 2009, White saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  R. 577-80.  White reported pain in his left knee and sometimes in his feet.  White stated that he could

not stand or walk for long periods due to pain in his left knee and left hip.

He stated that he had left knee pain since 2007.  White rated his pain at the

time of the examination on a scale of 1-10 as 8 to 10.  R. 577.  On

examination, White could bear weight and ambulate without any

ambulatory aids.  White walked with an antalgic gait favoring his left knee.

He walked with a limp.  R. 578.  White could perform both fine and gross

manipulations with both hands.  He had some swelling in his left knee.

Straight leg raising testing was negative and White had full range of motion

in his hips and right knee.  Dr. Chapa could not fully examine the left knee

because of White's complaints of pain.  Dr. Chapa diagnosed White with

post-operative left knee surgery with persistent pain and diabetes.  R. 579.

On June 17, 2009, Timothy Lalk a vocational rehabilitation counselor

employed by England Company Rehabilitation Services, Inc., of St. Louis,

Missouri, issued a fourteen page Vocational Rehabilitation Evaluation of

White.  R. 657-70.  Lalk reviewed rehabilitation reports, medical records,

and interviewed White and performed some vocational testing of White.  R.

657-62.  Lalk concluded:

> If I consider Mr. White's description of his symptoms, his
> limitations based upon his need to control and relieve his
> symptoms, his history and the results of the testing, and a
> review of all of the medical records, it is my opinion that Mr.
> White is not able to secure and maintain employment in the
> open labor market and is not able to compete for any position.  I

do not believe that any employer in the normal course of
business would consider Mr. White for employment.

R. 670.

On June 18, 2009, stated agency physician Dr. David Mack, M.D.,
prepared a Residual Functional Capacity Assessment.  R.584-91.  Dr.
Mack's opined that White could lift and/or carry ten pounds frequently and
no more occasionally; could stand and/or walk for two hours in an eight-
hour day; could sit for six hours in an eight-hour day; could never crawl or
climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs,
stoop, kneel, or crouch; and should avoid concentrated exposure to
hazards.  R. 584-88.  Dr. Mack opined, "Limitations as indicated by the clmt
are viewed as partially credible as the severity is not fully supported."  R.
591.

On February 1, 2010, White underwent a sleep study.  Dr. James
Abraham, M.D., conducted the study.  Dr. Abraham found that White had
severe sleep apnea.  Dr. Abraham recommended use of a continuous
positive air pressure (CPAP) machine during sleep.  Dr. Abraham
recommended a pressure of at least 13 cms of water.  Dr. Abraham stated
that the CPAP used in the study was set at a suboptimal level.  Dr.
Abraham stated that if White is excessively sleepy, he should avoid driving

or participating in activities that require alertness until he can be treated appropriately.  R. 617-17, 673-74.

In May and June 2010, Dr. David Coultas, M.D., ordered an x-ray and MRI of White's lower back.  White was complaining of lower back pain that radiated down both legs.  R. 678.  The x-ray was taken on May 29, 2010, and the MRI was performed on June 30, 2010.  R. 676, 678.  The x-ray was negative.  R. 676.  The MRI showed no disc herniation, no spinal stenosis, no neural foraminal encroachment, and no fracture.  The radiologist conducting the MRI study stated, "The etiology of this patient's pain is not apparent on this exam."  R. 678.

On August 4, 2010, White underwent an MRI his lower extremities. The study was ordered by Dr. Naheed T. Bashir, M.D.  The MRI of his knee was suspicious for a non-displaced probable chronic tibial plateau fracture. The MRI also showed advanced degenerative changes but no appreciable osteochondral defect, loose body, or evidence of internal derangement of the left knee.  R. 680-81.

On August 23, 2010, White had his left hip x-rayed.  Dr. Bashir ordered the x-ray.  The x-ray showed no acute fracture and osteoarthritis with subchondral cyst at the acetabulum.  R. 683.

On September 27, 2010, White saw Dr. Bashir for pain management. Dr. Bashir noted that White's overall functioning was poor. Dr. Bashir diagnosed White with lumbar facet arthropathy/degenerative disc disease/spondylosis, left knee pain, and left hip pain. R. 687.

The Administrative Law Judge (ALJ) conducted a hearing on April 6, 2011, by video conference. R. 46-70. The ALJ presided in Peoria, Illinois. White appeared in person and with his attorney in Springfield, Illinois. A vocational expert, Dr. James Lanier, also appeared at the hearing in Springfield.[2] R. 48.

White testified first. White testified that he was between five feet nine and one-half inches to five feet ten inches tall and weighed 294 pounds. R. 50. White testified that he gained about fifteen pounds in the last year. R. 50. White was unmarried. He had children ages 20, 19, 18, 15, and 10. He lived with his girlfriend and the two youngest children, the 15 year old girl and 10 year old boy. They lived in a two-story house. White's bedroom and bathroom were on the main level. R. 51-52. White testified that he last worked on April 23, 2007. R. 54. White testified that the medications caused side effects of fatigue, weakness, and headaches. R. 54.

---

[2] The court reported spelled Dr. Lanier's name phonetically as Laneer. R. 48. The record indicates that Lanier is the correct spelling. See R. 363.

White testified that he could not work because his left side and lower back hurt constantly.  R. 55.  He testified that he could not do anything for very long.  He testified, "I mean, I don't—it's hard for me to stand up for long periods of time, it's hard for me to sit down for long periods of time, walk, move around, bend, stand, you know."  R. 55.  White testified that he could sit for twenty minutes and stand for thirty to forty-five minutes.  R. 55. He could alternate between sitting and standing for about an hour and a half and then would need to lie down.  R. 56.  He testified that he could walk forty to fifty yards and could lift thirty to forty pounds once or twice a day.  R. 56.  He testified that he could not frequently lift and carry ten pounds a day.  R. 57.  He testified that he did not have any difficulty pushing or pulling.  R. 57.

White testified that he drove about fifteen to twenty miles a week. White testified that he took care of his personal hygiene, dress and feed himself.  He testified that shaving and bathing are difficult.  R. 57.  White testified that he could use a microwave to heat food, could make a sandwich, and pour a bowl of cereal.  R. 57.

White testified that he did not do laundry, but ran a vacuum and made beds on occasion.  White went grocery shopping.  He testified that he leaned on the cart for support.  R. 58.

On examination by his counsel, White testified that he had great difficulty walking.  He testified that his gout flared up every four months.  He testified that he had gout in both big toes.  The gout attacks would last two weeks or more.  During those times, White testified that he did not put on shoes or do anything.  R. 59-60.

White testified that he left knee would swell with any activity.  White testified that when the knee would swell, he would lie down and ice the knee, "and then I'm done for the day."  R. 61.  White testified that sitting through the hearing was very painful, "It's hard for me to sit her and not move because right now my back and my legs are on fire, I mean, really hurting."  R. 61.

White testified that his son was playing basketball at school.  He went once to watch, but he did not go again because he had too much pain.  R. 62.  He testified that walking to and from the car to the game was painful and sitting on the bleachers was painful.  R. 63.  White testified that he took Fluoxetine for depression.  R. 62.

Dr. Lanier then testified.  The ALJ asked him to assume a person with White's age, education, and work experience who cannot lift more than thirty-five pounds, can do not crawling or heavy shoveling.   The ALJ asked if such a person could perform White's past relevant work.  R. 64.  Dr.

Lanier opined that such a person could perform White's past work as a cashier.  R. 64.

The ALJ then asked Dr. Lanier to assume that the person was limited to medium work with no kneeling or squatting.  Dr. Lanier opined that the person could do the past work of cashier and cook.  R. 64-65.

The ALJ then asked Dr. Lanier to assume the person was limited to light work with occasional ramps, stairs, stooping, kneeling and crouching, but no crawling or climbing ropes, ladders, or scaffolds.  Dr. Lanier opined the person could perform the cashier job.  R. 65.

The ALJ then asked Dr. Lanier to assume, "The individual is limited to sedentary work, limited to occasional ramps, stairs, stooping, kneeling and crouching with no ropes, ladders, scaffolds or crawling.  How would these restrictions affect the performance of claimant's past relevant work?"  R. 65.  Dr. Lanier opined that such a person could not perform White's past relevant work.  R. 65.

Dr. Lanier opined that such a person could perform the following jobs: (1) document preparer, with 1,300 such jobs in Illinois and 32,000 such jobs in the nation; (2) surveillance system monitor, with 1,500 such jobs in Illinois and 19,500 such jobs in the nation; and (3) addressor with 1,100 such jobs in Illinois and 83,000 in the nation.  R. 65.  Dr. Lanier testified

that the three jobs identified were representative of the types of jobs the person could perform and was not an exhaustive list.  R. 66.  Dr. Lanier testified that the three jobs gave the worker an option to alternate between sitting and standing to perform the jobs.  R. 66.

The ALJ asked Dr. Lanier to assume the person would miss four days of work a month.  Dr. Lanier opined that if a person missed more than one and one-half days a month he would be termination.  R. 66.  Dr. Lanier also opined that if a person needed extra breaks or rest periods such that they were less than eighty percent productive, then the person would be terminated.  R. 66.

White's attorney asked Dr. Lanier:

> All right.  So let's assume hypothetically an individual that is limited to sedentary occupations, but this individual has to have a sit/stand option at will, and furthermore has a need to elevate the lower extremity at least to the level of, you know, getting it up to like chest level for—after an hour of work for approximately a half an hour before returning to the position.  Could a person like that sustain any sedentary occupations in your opinion?

R. 68.  Dr. Lanier opined, "No."  R. 68.  The hearing then concluded.

## THE DECISION OF THE ALJ

The ALJ issued his decision on April 15, 2011.  R. 20-33.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.  20

C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely

impaired that he is disabled regardless of the claimant's age, education and

work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet, or be medically

equivalent to, one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant's impairments, combination of impairments, do not meet or

equal a Listing, then the ALJ proceeds to Step 4.

　　　　If the claimant is not so severely impaired, then Step 4 requires the

claimant not to be able to return to his prior work considering his age,

education, work experience, and Residual Functional Capacity (RFC).  20

C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his

prior work, then Step 5 requires a determination of whether the claimant is

disabled considering his RFC, age, education, and past work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005); <u>Knight v. Chater</u>, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that White met his burden at Steps 1 and 2.  He had not engaged in substantial gainful employment since April 23, 2007, and he suffered from the severe impairments of status/post left knee arthroscopy, severe osteoarthritis in the left knee, and obesity.  R. 26.

The ALJ found that White's impairments or combination of impairments did not equal a Listing.  The ALJ considered Listings for musculoskeletal impairments, specifically Listings 1.02 and 1.04.  The ALJ found that White did not meet these Listings because, "He is able to ambulate effectively and use his hands and for both fine and gross manipulations."  R. 27.

At Step 4, the ALJ first determined White's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work . . . including occasional stooping, kneeling, crouching, and climbing of ramps and stairs but no climbing of ladders, ropes, or scaffolds.

R. 27 (emphasis omitted).  The ALJ relied on the restrictions Dr. VanRyn imposed when White reached maximum medical improvement in 2008, the

consultative examination of Dr. Chapa, and the x-ray and MRI findings in the summer of 2010.  R. 29-30.  The ALJ did not mention or make any reference to Drs. Bone, Kozma, Mack, or Jhaveri.

In making the RFC finding, the ALJ found that White was not credible about the severity of his symptoms.  The ALJ found that the medical evidence did not support White's testimony about the severity of his impairments.  The ALJ also found that White's daily activities were inconsistent with the claimed severity of his condition.  The ALJ stated,

> He stated that he cooks simple meals, performs household chores such as washing dishes, making beds, driving, grocery shopping, and attending to his own personal hygiene.  The ability to perform these daily activities does not demonstrate that the claimant is not disabled; however, these activities do demonstrate the ability to sit, stand, walk, lift items, concentrate to complete tasks, and otherwise perform work activity within the proscribed residual functional capacity.

R. 31.  The ALJ found at Step 4 that White could not perform his past relevant work.  The ALJ relied on his RFC determination and the opinion of Dr. Lanier.  R. 31.

At Step 5, the ALJ found that White could perform a substantial number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of Dr. Lanier that White could perform the jobs of document

preparer, surveillance monitor, and addressor.  R. 32.  The LAJ did not

mention vocational counselor Lalk.

Based on these findings, the ALJ concluded that White was not

disabled.  R. 33.  White appealed the decision.  On December 12, 2012,

the Appeals Council denied White's request for review.  The ALJ's decision

then became the decision of the Acting Commissioner.  R. 1.  White then

filed this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  In making this review, the

Court considers the evidence that was before the ALJ.  <u>Wolfe v. Shalala</u>,

997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate" to

support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment.  <u>Delgado v. Bowen</u>, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir.

2008).  The ALJ must articulate at least minimally his analysis of all

relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his

conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).  In so

doing, the ALJ "must explain why contrary evidence does not persuade."

Berger v. Astrue, 516 F.3d 539, 544 (7th Cir. 2008).

In this case, the ALJ failed to articulate his analysis of all relevant

evidence.  The ALJ did not mention Drs. Bone, Kozma, Mack, or Jhaveri.

Dr. Kozma performed a consultative medical examination and Drs. Bone,

Mack, and Jhaveri opined as to White's residual functional capacity.  Dr.

Kozma's examination and the opinions of Drs. Bone, Mack, and Jhaveri are

clearly relevant, but the ALJ did not analyze this evidence at all; he did not

even mention the evidence.  The opinions of Drs. Bone, Mack, and Jhaveri

are generally consistent with the ALJ's RFC determination, at least with

respect to lifting and carrying, and so, the omission may not be prejudicial;

still, the ALJ should not completely omit relevant medical evidence of this

scope.

The ALJ further did not mention Lalk's report and opinion.  Lalk

opined that White could not maintain employment in the open labor market.

This opinion conflicts with the ALJ's findings at Steps 5 of the Analysis.[3]

The probative value of Lalk's opinion may be or may not be significant, but the ALJ must consider the opinion.  See SSR 06-03p, 75 Fed. Reg. 45593, 45596 (August 9, 2006).  Lalk's opinion is directly contrary to the ALJ's findings at Step 5.  Therefore, the ALJ should have explained why such "contrary evidence does not persuade."  Berger v. Astrue, 516 F.3d at 544.

The Commissioner argues that Lalk's opinion has no probative value because Lalk relied on White's recitation of his symptoms rather than the ALJ's RFC determination.  That may or may not be a valid basis to reject Lalk's opinion under these circumstances;  however, the ALJ was required to conduct that analysis and make a determination.  The ALJ failed to do so.

The Commissioner correctly notes that the ALJ is not required to mention every piece of evidence.  See Simila v. Astrue, 573 F.3d 503, 516 (7th Cir. 2009).  The ALJ, however, did not omit just one or two pieces of evidence.  He omitted four doctors' opinions and a conflicting opinion from a rehabilitation counselor.  The ALJ did not even allude to the existence of any of this evidence.  The ALJ may have properly

---

[3] This opinion is different from opinions that vocational experts give in answer to hypothetical questions posed by a claimant's counsel.  Lalk did not opine about a hypothetical question; Lalk opined that White could not work.  As such, the opinion is directly contrary to the ALJ's findings at Step 5.  The Court is not stating that an ALJ must discuss in a decision all hypothetical questions posed to a vocational expert.

rejected some or all of these opinions; he may have relied on some of the doctors' opinions as corroboration of Dr. VanRyn's opinions, but chose not to mention them; or he may have ignored the evidence and failed to consider it.  The Court cannot tell and the Court cannot speculate.  Failing to discuss or even mention this level of evidence, particularly the contrary evidence, is error.  The volume of the omissions is too great to be harmless, particularly because of the contrary evidence.  White is entitled to a thorough analysis by the ALJ.  The decision therefore should be reversed and remanded for further proceedings.

WHEREFORE this Court recommends that Plaintiff White's Motion for Summary Judgment (d/e 7) should be ALLOWED, Defendant Acting Commissioner of Social Security's Motion for Summary Affirmance (d/e 14) should be DENIED, and the decision should be reversed and remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of an ECF copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file a timely objection

will constitute a waiver of objections on appeal.  See *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.


ENTER:  June 13, 2013


*s/ Byron G. Cudmore*
UNITED STATES MAGISTRATE JUDGE